
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 14, 2016

**STATE OF TENNESSEE v. THOMAS ANTONIO RICKETTS**

**Appeal from the Criminal Court for Davidson County**
**No. 2013-D-3323    J. Randall Wyatt, Jr., Judge**

_____

**No. M2016-00816-CCA-R3-CD**

_____

The Defendant, Thomas Antonio Ricketts, entered guilty pleas in the Davidson County Criminal Court to two counts of facilitation of aggravated child abuse and one count of facilitation of aggravated child neglect.  The trial court imposed concurrent ten-year sentences for each count, to be served in confinement.  On appeal, the Defendant argues that his sentence was excessive and that the trial court erred in denying an alternative sentence.  Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR. and J. ROSS DYER, JJ., joined.

David A. Collins, Nashville, Tennessee, for the Defendant-Appellant, Thomas Antonio Ricketts.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Jennifer Smith, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

On December 2, 2013, the Defendant and his co-defendant, Ioka Kimbuke Kyles, were indicted for six counts of aggravated child abuse and one count of aggravated child neglect.  The Defendant entered guilty pleas to the lesser included offenses of facilitation of aggravated child abuse in counts one and five and facilitation of aggravated child neglect in count seven.  Counts two, three, four, and six were dismissed pursuant to a plea agreement.  The Defendant also agreed to be sentenced as a Range I, Standard Offender, with a range of eight to twelve years for each conviction and with all counts to run concurrently, leaving length and manner of service to be determined by the trial court.

At the guilty plea hearing, the State summarized the facts surrounding the offenses as follows:

On July 18, 2013, the victim, who was 7-years-old at the time, was admitted to Vanderbilt Children's Hospital with pain to his right arm. The doctors determined that he had a spiral fracture to that arm. It was also discovered that he had numerous bruises, abrasions, marks, scars, all over his entire body including pattern marks on his back.

The victim's weight was also severely low[,] and he was in less than the third percentile of his age. Both defendants were interviewed. Both defendants admitted to the time frame when the victim was in their exclusive care[,] and it was determined that the acute injuries that the victim had would have had to have occurred while he was in the defendants' care.

However, some of the older healing injuries could have been the result of something that might have happened by the biological mother. Both defendants stated that the victim's arm was broken as the result of another sibling stepping on his arm. However, the Vanderbilt Care Team stated that this was not consistent with this type of fracture and all of the markings on the victim's body were a concern for abuse.

When confronted with the marks on the victim, the defendants first stated that the victim scratches himself and throws himself into a dresser when he is in the corner during time-out. When confronted with the markings that were all over the victim, they then stated that this was the result of a peanut butter allergy.

The victim was interviewed by several people. Initially, he stated that his arm was broke because he slept on it wrong; and then he stated that his arm was broke because a sibling stepped on it; and then he stated that the marks on his body were the result of a peanut butter allergy. However, he later stated that it was both of the defendants that twisted his arm that caused his broken arm. He told the forensic interviewer that both defendants beat him with whips and switches all over his body.

He told the forensic interviewer that he was made to stand in the corner all day without bathroom breaks and that when he peed on himself he would get punished. He told the forensic interviewer that he was denied food as punishment.

- 2 -

The roommate at the time, Jimmy Young, was interviewed by the police and he told the police that he heard the victim being spanked, for peeing on himself, during one specific time approximately 15 to 20 times with a belt, when he entered the room he saw defendant Kyles holding the victim down on the bed while defendant Ricketts was beating him with the victim's face in the mattress. Mr. Young told the police that the victim was beat every single day. Mr. Young told the police that the victim was made to stand in the corner from when he got up in the morning until night time. He told the police that the victim was deprived food and water and he was the only child that was not allowed outside to play with the other kids.

The neighbor, Mr. Stephen Willis, was also interviewed. He told the police that he saw the victim standing in the corner all day in his underwear. At one point, he saw the victim standing in the corner in his own filth[,] and he also stated that at one point the roommate, Jimmy Young, came over to his house and was in tears because of how the victim had been treated.

All of this occurred here in Davidson County and based upon these facts the State recommends the previously announced disposition.

The trial court accepted the Defendant's guilty pleas and set the matter for sentencing.

**Sentencing Hearing.** At the March 31, 2016 sentencing hearing, the Defendant's presentence report was introduced without objection. The Defendant's criminal history includes seven convictions for driving with a suspended license or revoked license, two convictions for domestic assault, one conviction for evading arrest, one conviction for resisting arrest, and two simple assault convictions.

Detective Kenney, a detective with the Youth Services division, testified that he began an investigation of the Defendant and his co-defendant, Kyles, in July 2013, after the victim was admitted to the hospital for arm pain. The victim's arm had a lateral condyle fracture, which commonly results from the arm being grabbed and forcibly pulled toward the center of the body. The examination also revealed that the victim had fresh and healing marks, scars, and lesions covering his face, neck, shoulders, back, hips, buttocks, groin area, and legs. Detective Kenney identified multiple photographs of the victim taken at the hospital on the day he was admitted and these photographs were introduced as an exhibit. The victim was also diagnosed with a "failure to thrive" because he was underweight and his weight had decreased since his last hospital visit one year prior.

The victim initially told hospital staff that he had injured his arm by sleeping on it wrong. The victim was then interviewed at the hospital by Department of Children's Services ("DCS"), and he disclosed that the Defendant had injured his arm by grabbing it and twisting it. Detective Kenney testified that the victim "indicated that if he had to tell the truth again that he would get beaten." Detective Kenney interviewed the victim at the hospital and recalled that he was "very distraught, very withdrawn, almost terrified."

Detective Kenney testified that the victim was later interviewed at the Children's Advocacy Center where he told the forensic interviewer that the Defendant had caused his arm injury. The victim also told the forensic interviewer that the Defendant and Kyles would force him to stand in a corner facing the wall for extended periods of time as punishment for wetting himself and that if he left the corner or had an accident he would be beaten. Detective Kenney took photographs of the corner where the victim was forced to stand, and the photographs were admitted at the hearing. Detective Kenney testified that the victim also told the forensic interviewer that he was often beaten by hand or with a belt and was denied food and water while the other kids in the house played outside. The victim told the interviewer that he was the only child in the household who received physical discipline.

Detective Kenney explained that, at the time of the incident, the victim was living with his father, the Defendant, and the Defendant's girlfriend, Kyles. Also living in the home were the Defendant's other minor son and a roommate, Jimmy Young. Detective Kenney testified that the victim was originally in his mother's custody but was removed by DCS in 2012 due to truancy issues and "lack of stable housing and environmental concerns." The victim was then placed in the custody of his grandmother, the Defendant's mother, Thelma Pinkerton. In May 2013, the Defendant and Pinkerton agreed that the victim and his brother would live with the Defendant during the summer. Pinkerton told Detective Kenney that, when the victim went to live with the Defendant in May 2013, he had no visible injuries other than minor scratches and a burn mark that had possibly occurred while he was in his mother's care.

Detective Kenney interviewed the Defendant three times. The Defendant told Detective Kenney that the victim's arm injury occurred when the other kids in the apartment jumped on his arm. When Detective Kenney asked the Defendant about the marks and bruises on the victim's body, the Defendant gave two different answers. In the first interview, the Defendant claimed that the victim scratches himself and would "bang[] his head on the wall and throw[] himself into the corner." The Defendant claimed that he had a video of the victim's behavior and that the victim was getting help for this behavior from Centerstone. Detective Kenney testified that he contacted Centerstone and there was no record of the victim receiving treatment or medication for this alleged behavior. Detective Kenney testified that he did not receive a copy of this video.

In the second interview, the Defendant stated that some of the marks were caused by a peanut butter allergy and that some of the marks were caused by the victim's mother. The Defendant also stated that he had a video of the victim's mother beating the victim. However, Detective Kenney testified that he did not receive a copy of this video. The Defendant then stated that he reported the victim's mother to DCS. Detective Kenney testified that he contacted DCS and there was no record of a report by the Defendant. The Defendant did admit to Detective Kenney that he made the victim stand in the corner as "a form of punishment" but that he only stood in the corner for fifteen to thirty minutes at a time.

Jimmy Young testified that the Defendant and Kyles lived with him for about a year in 2013. Young confirmed that the victim and six or seven other children lived in the house during the summer of 2013. Young recalled seeing the Defendant beat the victim with a belt while Kyles held him down and the other children watched. Young also confirmed that the victim was sometimes forced to stand in the corner all day. Young testified that the victim was allowed outside on the porch but was not allowed to play with the other children.

Stephen Willis testified that the Defendant and Kyles lived next door to him. Willis recalled observing the victim standing in the bedroom with his nose in the corner. Willis testified that the victim was alone in the house wearing only soiled underwear. Willis offered the victim food and water, but the victim refused and said "[t]hey will hurt me." Willis testified that he observed this on at least four or five separate occasions over a two-week period.

The victim testified but could not recall the time around when his arm was broken or earlier statements that he had made. The State introduced a recording of the forensic interview, which the trial court later reviewed when taking the Defendant's sentencing under advisement.

Thelma Pinkerton, the Defendant's mother, testified that she currently had custody of the Defendant's two minor sons, T.R. and the victim. Pinkerton testified that the victim was treated "bad" by his mother and that he suffered a burn on his leg while he was in his mother's care. Pinkerton testified that victim spent some time with his mother during the summer of 2013, but to her knowledge the victim did not suffer any injuries while he was with his mother. Pinkerton did not believe that the Defendant abused the victim, and if the Defendant were released, she would allow the Defendant to visit the victim.

T.R., the Defendant's minor son, testified that he was looking forward to the Defendant's release and that he was not scared of the Defendant. He also testified that he was not afraid of Kyles and that she would not hurt him or his brother.

After hearing the proof and arguments from counsel, the trial court took the matter under advisement to determine the appropriate length and manner of service for the Defendant's three convictions.[1] On April 14, 2016, the trial court entered an order sentencing the Defendant to ten-year sentences for each count and ordered that count seven would run consecutively to counts one and five, for a total effective sentence of twenty years' incarceration. However, the trial court was unaware that the plea agreement specified that the Defendant's sentences would run concurrently. On April 15, 2016, the trial court entered an amended order stating that the Defendant's sentences would run concurrently, for a total effective sentence of ten years' incarceration. It is from this order that the Defendant now timely appeals.

## ANALYSIS

On appeal, the Defendant challenges the length and manner of his sentence. Specifically, he argues that his criminal history did not justify the length of his sentence and the trial court should have ordered, "some form of alternative sentencing." The State argues that the trial court did not abuse its discretion by imposing a "within-range" sentence or by ordering the Defendant to serve his sentence in confinement. We agree.

We review the length and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). Moreover, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Id. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id.

"[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). A trial court must consider the following when determining a defendant's specific sentence and the appropriate combination of sentencing alternatives: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and

---

[1] The Defendant did not make an allocution.

characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in sections 40-35-113 and 40-35-114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. §§ 40-35-210(b)(1)-(7). In addition, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(5). The court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. §§ 40-35-103(2), (4).

Any sentence that does not involve complete confinement is an alternative sentence. See generally State v. Fields, 40 S.W.3d 435 (Tenn. 2001). In determining whether to deny alternative sentencing and impose a sentence of total confinement, the trial court should consider whether:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1)(A)-(C); see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

A defendant is eligible for probation if the actual sentence imposed upon the defendant is ten years or less and the offense for which the defendant is sentenced is not specifically excluded by statute. T.C.A. § 40-35-303(a). An especially mitigated or standard offender convicted of a Class C, D, or E felony shall be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary. Id. § 40-35-102(6)(A). However, a trial court "shall consider, but is not bound by, the advisory sentencing guideline" in Tennessee Code Annotated section 40-35-102(6)(A). Id. § 40-35-102(6)(D). Despite a defendant's eligibility, he or she is not automatically entitled to probation as a matter of law. Id. § 40-35-303(b), Sentencing Comm'n Cmts. Moreover, the defendant bears the burden of establishing her suitability for probation. Id. § 40-35-303(b). "The abuse of discretion with a presumption of reasonableness standard of review . . . also applies to a trial court's decision to grant or deny probation." Caudle, 388 S.W.3d at 278-79.

- 7 -

As to the length of his sentence, the Defendant does not dispute his Range I, Standard Offender status, which subjected him to a sentencing range of eight to twelve years. Rather, the Defendant appears to argue that the trial court placed a "great emphasis" on the Defendant's criminal history, which consisted primarily of traffic offenses. He also argues that the trial court "mischaracterized" his criminal record and found that the Defendant had a "significant criminal history [by] citing two felony convictions for aggravated assault that do not, in fact, exist." As an initial mater, the Defendant risks waiver of this issue because his brief and reply brief fails to address why his ten-year sentence was improper and how the trial court abused its discretion. Waiver notwithstanding, the record fully supports the trial court's imposition of a ten-year sentence. Here, the trial court did not "mischaracterize" the Defendant's criminal history and did not find that the Defendant had two prior convictions for aggravated assault. The trial court found that the Defendant had a "significant criminal history, including two convictions for assault, two convictions for domestic violence, and numerous convictions for violating the driver's license law, and several other miscellaneous convictions." The trial court also explicitly recognized "that all of [the Defendant's] convictions are for misdemeanors." Therefore, the Defendant's argument that the trial court "mischaracterized" his criminal history is without merit.

In determining the appropriate length of the Defendant's sentence, the trial court also found that "[t]he defendant was a leader in the commission of an offense involving two (2) or more criminal actors[,] . . . the Defendant treated the victim 'with exceptional cruelty' in the commission of the offense[,] . . . and the personal injuries inflicted upon the victim were particularly great." See T.C.A. § 40-35-114 (2), (5), (6). The trial court thoroughly considered the evidence presented at the sentencing hearing, including the Defendant's presentence report, the witnesses' testimony, and the victim's forensic interview. Furthermore, after considering all the evidence, the trial court did not find any mitigating factors. Because the record shows that the trial court carefully considered the evidence, the enhancement and mitigating factors, and the purposes and principles of sentencing prior to imposing a sentence of ten years, the Defendant has failed "to either establish an abuse of discretion or otherwise overcome the presumption of reasonableness afforded sentences which reflect a proper application of the purposes and principles of our statutory scheme." Caudle, 388 S.W.3d at 280. The Defendant is not entitled to relief.

Next, the Defendant argues that the trial court erred in denying the Defendant "some form of alternative sentencing." Again, the Defendant argues that the trial court "mischaracterized" his criminal record and found that the Defendant had a "significant criminal history" [by] citing two felony convictions for aggravated assault that do not, in fact, exist." The Defendant also argues that "measures less restrictive than confinement" have not been "frequently or recently" applied. Specifically, the Defendant claims that

although his diversion was revoked, he was only placed on diversion once, ten years ago, and this does not support the trial court's denial of an alternative sentence. As an initial matter, because the Defendant was convicted of three Class B felonies, he is not considered a favorable candidate for alternative sentencing. See T.C.A. § 40-35-102(6)(A). We have already determined that the trial court did not "mischaracterize" the Defendant's criminal history. However, in addition to finding that "confinement [was] necessary to protect society by restraining a defendant who has a long history of criminal conduct," the trial court also found that confinement was necessary to "avoid depreciating the seriousness of the offense [and] confinement [was] particularly suited to provide an effective deterrence to others likely to commit similar offenses." T.C.A. § 40-35-103(1)(A)-(B). The trial court determined that this was an "extremely serious offense and that the sentence must reflect its severity." The record shows that the trial court properly considered these two factors in denying an alternative sentence.

Finally, although the trial court did not include an analysis of whether less restrictive means had been applied in the past, the Defendant's presentence report shows that the Defendant was granted diversion for one of his domestic violence convictions and that his diversion was later revoked. Moreover, the trial court found that the two remaining factors were established by the record, and "the trial court was only required under the Sentencing Act to find one of the aforementioned reasons to properly confine the Defendant." State v. Christopher Allen, No. W2016-00505-CCA-R3-CD, 2017 WL 764552, at *4 (Tenn. Crim. App. Feb. 24, 2017), no perm. app. filed. The record shows that the trial court properly relied on the Defendant's criminal history, the seriousness of the offense, and general deterrence in denying alternative sentencing. Accordingly, we conclude that the Defendant has failed to show that the trial court's decision was not "based upon the purposes and principles of sentencing." Caudle, 388 S.W.3d at 279. The Defendant is not entitled to relief.

## CONCLUSON

Upon review, we affirm the judgments of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE

- 9 -